Hon. M. James Lorenz, United States District Judge
Pending before the Court in this putative class action alleging violation of antitrust laws is Defendants' motion to dismiss the first amended complaint pursuant to Federal Rule of Civil Procedure 12(b)(6). Plaintiff filed an opposition and Defendants replied. The Court decides the matter on the papers submitted and without oral argument pursuant to Civil Local Rule 7.1.d.1. For the reasons which follow, Defendants' motion is denied.
I. BACKGROUND
Plaintiff Persian Gulf, Inc. operates a gas station, which purchases gas from Defendant refineries. It filed this action against Defendants BP West Coast Products LLC ("BP"), Chevron U.S.A. Inc. ("Chevron"), Tesoro Refining & Marketing Company LLC ("Tesoro"), Equilon Enterprises *1146 LLC d/b/a Shell Oil Products US ("Shell"), ExxonMobil Refining & Supply Co. ("Exxon"), Valero Marketing and Supply Co. ("Valero"), ConocoPhillips ("Phillips"), and Alon USA Energy, Inc. ("Alon").
Plaintiff contends Defendants conspired to manipulate the wholesale gasoline market in California, causing historically high wholesale prices in 2012 and 2015. It filed a complaint alleging violations of the Sherman Antitrust Act, 15 U.S.C. § 1 et seq. ("Sherman Act"), the Cartwright Act, Cal. Bus. & Prof. Code § 16700 et seq. ("Cartwright Act"), and the Unfair Competition Law, Cal. Bus. & Prof. Code § 17200 et seq. ("UCL"). The Court has federal question jurisdiction over the Sherman Act claim pursuant to 28 U.S.C. § 1331, and supplemental jurisdiction over the Cartwright Act and UCL claims pursuant to 28 U.S.C. § 1367.
Defendants successfully moved to dismiss the initial complaint for failure to allege conspiracy. Plaintiff was granted leave to amend. In the amended complaint ("FAC"), Plaintiff added numerous detailed factual allegations to shore up its allegation of conspiracy. Pending before the Court is Defendants' motion to dismiss the amended complaint.
II. DISCUSSION
A motion under Rule 12(b)(6) tests the sufficiency of the complaint. Navarro v. Block , 250 F.3d 729, 732 (9th Cir. 2001). Dismissal is warranted where the complaint lacks a cognizable legal theory. Shroyer v. New Cingular Wireless Serv., Inc. , 622 F.3d 1035, 1041 (9th Cir. 2010). Alternatively, a complaint may be dismissed where it presents a cognizable legal theory, yet fails to plead essential facts under that theory. Robertson v. Dean Witter Reynolds, Inc. , 749 F.2d 530, 534 (9th Cir. 1984). Defendants' motion attacks the sufficiency of Plaintiff's factual allegations.
The court must accept as true all allegations of material fact and construe them in the light most favorable to the nonmoving party. Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007) ; Cedars-Sinai Med. Ctr. v. Nat'l League of Postmasters of U.S. , 497 F.3d 972, 975 (9th Cir. 2007). "A well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and that a recovery is very remote and unlikely." Twombly , 550 U.S. at 556, 127 S.Ct. 1955 (internal quotations and citation omitted). On the other hand, legal conclusions, even if cast in the form of factual allegations, "are not entitled to the assumption of truth." Ashcroft v. Iqbal , 556 U.S. 662, 679, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009).
A. Sherman Act
"The antitrust laws of the United States aim to protect consumers by maintaining competitive markets." In re Musical Instruments & Equip. Antitrust Litig., 798 F.3d 1186, 1191 (9th Cir. 2015). To this end, the Sherman Act provides:
Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal.
15 U.S.C. § 1. The Act "prohibits agreements that unreasonably restrain trade by restricting production, raising prices, or otherwise manipulating markets to the detriment of consumers." Musical Instruments , 798 F.3d at 1191.
Because § 1 of the Sherman Act does not prohibit all unreasonable restraints of trade but only restraints effected by a contract, combination, or conspiracy, the crucial question is whether the challenged anticompetitive conduct stems from independent decision or from an agreement, tacit or express.
*1147 Twombly , 550 U.S. at 553, 127 S.Ct. 1955 (internal brackets, ellipsis, quotation marks and citations omitted). Horizontal agreements among competitors to fix prices, divide markets, refuse to deal, and similar agreements almost always tend to restrict competition, and violate the Sherman Act per se. Musical Instruments , 798 F.3d at 1191. Once such an agreement's existence is established, no further inquiry about the parties' intent or its effect on the market is required to establish a violation. Id.
As is often the case, Plaintiff lacks direct evidence of a horizontal agreement among Defendants. Instead, the complaint alleges parallel conduct and other corroborating facts in an effort to support a reasonable inference of agreement. The issue before the Court is whether Plaintiff pleaded sufficient facts to provide a plausible basis from which to infer "an agreement, tacit or express." Twombly , 550 U.S. at 553, 127 S.Ct. 1955.
The standard for pleading antitrust violations based on parallel conduct was developed in Bell Atlantic Corp. v. Twombly . See 550 U.S. at 553, 127 S.Ct. 1955.
While a showing of parallel business behavior is admissible circumstantial evidence from which the fact finder may infer agreement, it falls short of conclusively establishing agreement or itself constituting a Sherman Act offense. Even "conscious parallelism," a common reaction of firms in a concentrated market that recognize their shared economic interests and their interdependence with respect to price and output decisions is not in itself unlawful.
Id. at 553-54, 127 S.Ct. 1955 (internal brackets, ellipses, quotation marks and citations omitted). "[A]n allegation of parallel conduct and a bare assertion of conspiracy will not suffice," because this merely "mirrors the ambiguity of the behavior: consistent with a conspiracy, but just as much in line with a wide swath of rational and competitive business strategy unilaterally prompted by common perceptions of the market." Id. at 556 & 554, 127 S.Ct. 1955. Instead, the allegations "must be placed in a context that raises a suggestion of a preceding agreement." Id. at 557, 127 S.Ct. 1955. This "requires a complaint with enough factual matter (taken as true) to suggest that an agreement was made." Id. at 556, 127 S.Ct. 1955. For example, "parallel behavior that would probably not result from chance, coincidence, independent responses to common stimuli, or mere interdependence unaided by an advance understanding among the parties," or "conduct that indicates the sort of restricted freedom of action and sense of obligation that one generally associates with agreement," would suffice to state a claim. Id. at 556 n.4, 127 S.Ct. 1955 (internal quotation marks, brackets and citations omitted).
"Heightened fact pleading of specifics" is not required. Id. at 570, 127 S.Ct. 1955 ; see also id. at 569 n.14, 127 S.Ct. 1955.
The need at the pleading stage for allegations plausibly suggesting (not merely consistent with) agreement reflects the threshold requirement of Rule 8(a)(2) that the "plain statement" possess enough heft to "sho[w] that the pleader is entitled to relief." A statement of parallel conduct, even conduct consciously undertaken, needs some setting suggesting the agreement necessary to make out a § 1 claim; without that further circumstance pointing toward a meeting of the minds, an account of a defendant's commercial efforts stays in neutral territory.
Id. at 557, 127 S.Ct. 1955.
Conspiracy can be distinguished from unilateral parallel conduct "by looking for certain 'plus factors.' " Musical Instruments , 798 F.3d at 1194.
*1148 Whereas parallel conduct is as consistent with independent action as with conspiracy, plus factors are economic actions and outcomes that are largely inconsistent with unilateral conduct but largely consistent with explicitly coordinated action.
Id. (internal citation omitted). Plus factors can place parallel conduct in a context that raises a reasonable inference of conspiracy. Id. (citing Twombly , 550 U.S. at 557 n.4, 127 S.Ct. 1955 ; In re Citric Acid Litig. , 191 F.3d 1090, 1102 (9th Cir. 1999) ). Examples of "plus factors" are: common motive to conspire, action against self-interest, government investigation, participation in trade associations, and parallel pricing. Musical Instruments , 798 F.3d at 1194. The plus factors are examined individually and cumulatively to determine whether they provide sufficient context to infer that the defendants' behavior likely would not occur as independent responses to common market stimuli. If so, the conspiracy allegation is plausible rather than merely possible. Id.
1. California Market
According to the first amended complaint, California gasoline market is isolated from the rest of the United States because no pipelines cross the Rocky Mountains, and state law mandates a specific gasoline formulation during the spring and summer months. The supply is highly concentrated. The top two refiners control nearly half of California capacity, and the top four control nearly 80%. Defendants, the top seven refiners, control more than 92% of the market.
Gasoline demand in California is largely inelastic, in that it does not respond much to the change in price. However, a small reduction in supply produces a sharp increase in price. (FAC at 48-52.) Information about current inventory or future supply therefore has an immediate effect on price.
Plaintiff alleges that Defendants conspired to manipulate the market. One mechanism Plaintiff suggests is Defendants' uniform practice of keeping to themselves the data concerning their industry and operations, including refinery shutdowns and planned output, while spreading misleading information to the public. Lack of reliable information renders a concentrated market more susceptible to manipulation. On the other hand, Defendants shared much of real operational information among themselves through exchange agreements, which allowed them to trade petroleum products at an agreed rate when they were short on supply. An exchange agreement signals to the other party the amount of time a refinery is expected to be offline. (FAC at 42-43.)
2. Price Spikes in 2012
According to Plaintiff, in May and October 2012 the California market experienced a combination of increasing inventories, and yet historically high prices. This typically does not occur in a normally-functioning competitive market. During the same time period, Defendants' profits were higher than expected based on the oil prices and inventories alone. Although gas prices in the rest of the United States declined, California gas prices reached historic peaks.
Defendants, through public statements made independently and through their trade associations, indicated that prices spiked because gasoline supply was reduced due to refinery shutdowns. For example, the Western States Petroleum Association ("WSPA"), a trade group to which Defendants belonged,[1] attributed *1149 the May 2012 price spike to decreased supply from a February fire at BP's Washington refinery and maintenance shutdowns at various other refineries.
Plaintiff contends this explanation was misleading for several reasons. The BP fire in February could not have contributed to the price spike three months later. Based on historical data, if the fire had caused a meaningful supply disruption, with all other factors being equal, the price would increase much sooner. Further, the industry data showed that Defendants had sufficient production capacity available to make up even a significant supply lost to a fire.
With respect to the maintenance shutdowns, during the short window of less than four weeks between April 20 and May 15, Alon, Shell, Tesoro, Chevron and BP each scheduled to shut down their refineries for maintenance. Contrary to Defendants' representations, the emissions data showed that certain refineries were not shut down, but continued to operate. Consistent with his data, Defendants' gasoline inventory increased during the same time period.
Plaintiff's theory of the case is that Defendants conspired to create a false impression of reduced supply, when in fact they possessed the inventory and production capacity to supply the California market. (FAC at 1-5, 16-24.) In a normally operating market, competitors use their existing inventory and production capacity to increase their individual market shares and/or to profit from any price increases caused by decreased supply from other competitors. A competitor who reduces supply to the market (for example, by withholding inventory or reducing production) is exposed to the risk that others will capture its market share. Defendants' actions did not follow this pattern. They announced to the public that supply disruptions had occurred or were coming due to refinery fires and maintenance, and held back some of their inventory and/or did not produce as much as they could. Plaintiff posits that Defendants' actions make sense only if an agreement assured that Defendants who had reduced their supply to the market would not be exploited by Defendants who did not. Only then could they collectively reap windfall profits from the price increase occasioned by the artificial supply disruption. Plaintiff argues that the allegations of Defendants' coordinated action in spreading misinformation and creating a false shortage supports the inference that they conspired with intent to manipulate gasoline prices in California.
Prices spiked again in October 2012. Defendants attributed this to the October 1, 2012, power failure at the Exxon Torrance refinery. Plaintiff again contends this explanation was misleading. It alleges that all indications, including later information from California Energy Commission, were that the problem at the Torrance refinery was minor, and that Exxon's press releases overstated it. The emissions data shows that the problem did not cause a complete refinery shutdown. Further, the same refinery reported 27 similar events in 2012, but none of them triggered price increases on the scale seen in October 2012. Finally, prices started to increase before the power failure was publicly announced, and spiked much faster than normal-within 45 minutes of the first substantive media coverage.
*1150 According to Plaintiff, the price spiked because Defendants, despite high inventory levels and available production capacity, ran on the market following advance notice by Exxon that it would report problems at its Torrance refinery. (FAC at 17-18.) In a normal, competitive market, other Defendants would have used their available inventory and production capacity to take advantage of Exxon's temporary production disruption, rather than purchase on the open market. Plaintiff contends that Defendants' run on the market was staged to create a false impression that a serious supply disruption was coming, and argues that the run on the market would be irrational in the absence of an agreement.
Several United States Senators urged the Oil and Gas Price Fraud Working Group of the Department of Justice to investigate possible market manipulation by, among other things, Defendants' false or misleading public reports which may have created a perception of a supply shortage, when refineries were in fact producing, and their possible connection to the 2012 price spikes. According to the FAC, this investigation is ongoing. Independently, Senator Diane Feinstein urged the Federal Trade Commission to investigate the same price spikes. (FAC at 1-5, 16-24, 59-60.)
Defendants counter that Plaintiff's theory of conspiracy makes no sense because Plaintiff contradicts itself when it alleges both, that the prices rose due to supply shortages, and that Defendants were not short on supply. This is a misunderstanding of Plaintiff's theory of the case. Plaintiff's theory is that the prices shot up because Defendants intentionally and jointly created a false impression of shortage.
3. Price Spikes in 2015
California gasoline prices spiked three times in 2015. The first spike occurred in mid-May, the prices culminated in mid-July, and rose again at the end of the year, although not as sharply as before. According to Plaintiff, the price increase in California was much greater than the moderate increase in the rest of the United States. Although gas prices in California are usually higher than in other states, the price differential in early 2015 was two to three times greater than usual. This was despite the simultaneous decline in crude oil prices and the other major cost components remaining largely unchanged. In comparison to March 2014, as of March 2015, Defendants' margins increased by more than 400%. In 2015, the average refiner margins were more than double the prior 16-year average, resulting in historically unprecedented profits.
As in 2012, publicly, including through WSPA, Defendants attributed the dramatic price increases to supply troubles caused by Tesoro's Martinez refinery, which was shut down on February 2, 2015, due to a labor strike, and Exxon's Torrance refinery explosion on February 18, 2015. Plaintiff contends that this explanation was misleading.
Plaintiff alleges that at the end of 2014, Defendants exported record amounts of gasoline from California. Accordingly, gasoline inventories during the first quarter of 2015 were lower than normal. In the short time window of less than four weeks between February 5 and March 3, 2015, the prices rose by approximately 40%.
Tesoro's Martinez refinery was shut down on February 2-only days before the prices began their steep ascent. It had operated during past labor disputes, and, according to its former employees, could have continued to operate in this instance. Tesoro's CEO told investors that the refinery could have continued to operate indefinitely with reduced staffing despite the strike. Plaintiff argues that it was not necessary to shut it down, and that it was *1151 deliberately shut down to help deplete California inventories and cause the prices to spike. In a normal market, a participant would not risk its competitors taking a bite out of its market share, and therefore would not unnecessarily reduce production. In the absence of an agreement among Defendants, it makes little sense for Tesoro to idle its refinery, when it could have continued to produce.
Exxon's Torrance refinery accident on February 18 damaged its pollution monitoring equipment. Without an explanation, and although the prices had already started to rise at the time of the accident and continued to rise for months thereafter, the refinery was not repaired until mid-2016. During this time, through exchange agreements and minimal imports, Exxon secured just enough gasoline to avoid default on its contractual obligations. Although it could have made up the shortfall from the Torrance refinery by shipping from Singapore, where it owns one of the largest refineries in the world and produces gasoline in compliance with California regulatory requirements, it did not do so to any meaningful extent.[2] In a competitive environment, Exxon would be expected to sell as much of its gasoline as possible at the premium price available in California, and would not risk its competitors moving into its market share.
Furthermore, in the span of one month between April 17 and May 19, 2015, when gas prices were climbing toward the first peak of the year, Tesoro, Chevron and Phillips reduced or shut down production at six separate refineries for planned maintenance and/or unplanned repairs. In two instances, Chevron and Phillips advanced their scheduled maintenance to coincide with other, unplanned shut downs. Plaintiff posits that reducing output was against Defendants' individual self-interest, because they could have postponed, or at least not advanced, planned maintenance to sell the maximum possible amount at increased prices, and/or increase their relative market shares against the Defendants who could not continue producing.
Similarly, Exxon, whose production had been hampered by foregoing to repair its Torrance refinery, at the same time chose not to use its only Jones Act tanker to ship gasoline from other states.[3] The tanker was idled in the Gulf of Mexico, sent empty to Los Angeles, and then deployed to Singapore. At the end of August 2015, after having idled it for 70 days in Singapore, Exxon sent it back to Los Angeles. However, it did not unload any gasoline there. The gasoline was unloaded in Florida instead. Exxon had apparently decided to sit out the opportunity to sell as much as possible of its gasoline in mid-July 2015, when prices were at their peak.
Next, between June 25 and July 23, when California prices reached their highest level for the year, Defendants deployed nine tankers to export 100 million gallons of gasoline out of California. During the first three quarters of 2015, Chevron, which had two refinery shutdowns in April, exported six days' worth of total California market supply. During the summer alone, it exported 250 million gallons of gasoline. In July and August Defendants, including Chevron and Phillips, exported over 80 million gallons. Plaintiff argues that exporting was against Defendants' individual *1152 self-interest, when they could have sold their gasoline at a premium in California.
Between November 15 and December 22, the spring 2015 pattern of simultaneous shutdowns repeated with Tesoro and Chevron, which shut down four separate refineries. In February 2016, the four largest refiners-Tesoro, Chevron, Valero and Phillips-raised prices at their branded stations[4] in unison and by nearly the same amount. (FAC at 5-12 & 24-47.)
Defendants' actions again attracted government attention. In 2014, the California Energy Commission ("CEC") had established the Petroleum Market Advisory Committee ("PMAC") to provide advice in case of market manipulation.[5] On January 8, 2015, California state Senators wrote to California Attorney General expressing concern over manipulation of gasoline prices by oil companies, and requested the Justice Department to monitor and, if warranted, open an investigation into these practices. In May 2016, California Attorney General subpoenaed Exxon, Chevron, Tesoro, Shell, Valero and Phillips for information about gasoline supply shortages. (FAC at 12-16.) In August 2016, the California Environmental Protection Agency's Air Resource Board noted the greater than normal length of supply disruptions, and the duration and magnitude of the differentials between California and national gasoline prices since early 2015, although California gasoline formulation had not been changed, there was sufficient global refining capacity to meet the demand for California's formulation, and Defendants assured the regulators that they had excess production capacity. (Id. at 53.)
Defendants argue that inference of conspiracy in 2015 is not plausible. They point to the two-year gap between the alleged conspiracy in 2012 and 2015, and claim it is not plausible for a conspiracy to resume after a two-year hiatus. This argument is rejected. Plaintiff does not allege the conspiracy abated for two years. Furthermore, a plaintiff must cross a high threshold to allege conspiracy and must at the same time comply with Rule 11 of the Federal Rules of Civil Procedure. It is therefore reasonable, and expected, of Plaintiff to allege conspiracy only for the time periods for which it has factual and legal support. Finally, inferring abatement in Defendants' favor would counter the law that, at the pleading stage, allegations are construed in the light most favorable to the nonmoving party. See, e.g., Twombly, 550 U.S. at 555, 127 S.Ct. 1955.
Defendants next attempt to undermine Plaintiff's allegations regarding the California market in 2015. In this regard, they request judicial notice of a Power Point presentation from the PMAC June 30, 2015 meeting ("PMAC Power Point"). (Mot. at 20-21, 23, citing Defs' Req. for Jud. Notice Ex. 3 (G. Schremp, Recent Fuel Price Trends, Market Overview & Contributing Factors , p. 100-39).)
As a general rule, [federal courts] may not consider any material beyond the pleadings in ruling on a Rule 12(b)(6) motion. [They] may, however, consider materials that are submitted with and attached to the Complaint [and] unattached evidence on which the complaint necessarily relies if: (1) the complaint refers to the document; (2) the document *1153 is central to the plaintiff's claim; and (3) no party questions the authenticity of the document. [¶ ] Pursuant to Federal Rule of Evidence 201, [the courts] may also take judicial notice of matters of public record, but not of facts that may be subject to reasonable dispute. More specifically, [they] may not, on the basis of evidence outside of the Complaint, take judicial notice of facts favorable to Defendants that could reasonably be disputed.
United States v. Corinthian Colleges , 655 F.3d 984, 998-99 (9th Cir. 2011) (internal quotation marks and citations omitted).
The PMAC Power Point is not central to Plaintiff's claim. Although the complaint cites to the meeting materials, it does not cite to the PMAC Power Point. (Cf. FAC at 32 n.49 (citing p. 40 of the meeting materials) & Defs' Req. for Jud. Notice Ex. 3 (PMAC Power Point included in the meeting materials at p. 100-39).) Moreover, Plaintiff cites to the materials in support of the sole allegation that the increase in wholesale prices quickly spread to retail, while Defendants rely of the PMAC Power Point to dispute other allegations. Finally, the Court may not, at the pleading stage, take judicial notice of the PMAC Power Point to take notice of facts in Defendant's favor if the facts are subject to dispute. See Corinthian Colleges, 655 F.3d at 999. Defendants' activities in 2015 and their effect on the market are at the center of the dispute giving rise to this action. Accordingly, the Court does not take judicial notice of the facts discussed and conclusions reached in the PMAC Power Point to find for Defendants at this stage of the case.
Even if the Court were to rely on the PMAC Power Point, it does not support Defendants' arguments to the extent they contend. First, the PMAC meeting was held on June 30, 2015, and therefore does not address the maximum price spike for the year, which started after that date and culminated in mid-July. The PMAC Power Point also does not speak to any of Plaintiff's allegations regarding the second half of the year. Furthermore, although the PMAC Power Point states that gasoline prices had increased at the start of every year since 2011 by at least 60 cents per gallon, it does not negate Plaintiff's contention that the price increase at the start of 2015 was disproportionately steep. In the short span between February 5 and March 3 alone, the price increased by 90 cents. (Cf. PMAC Power Point at 119 & 120 with FAC at 40.) Further, the PMAC Power Point does not contradict the allegations that the first quarter inventories were unusually low, and exports unusually high. Defendants' argument that imports were unusually high and exports were at their normal levels is supported only with respect to the second quarter of the year. (See PMAC Power Point at 128, 130 & 139.) The conclusion reached in the PMAC's Power Point that the high prices were attributable to tight supply caused by refinery issues against the backdrop of lower than normal inventories (id. at 138 & 139) is not inconsistent with Plaintiff's theory of the case, as the PMAC Power Point does not address Plaintiff's contentions that the refinery issues were exaggerated and that low inventories were intentionally created by Defendants with the intent to drive up prices.
4. Analysis
Defendants attack the complaint by claiming, among other things, that the price increases were alleged only at the retail level, while this action was filed on behalf of gasoline wholesalers. Defendants' argument is not persuasive because Plaintiff alleged that increases at the wholesale level quickly spread to retail. (FAC at 32 & n.49.) This fact is sufficient to infer that *1154 the effect of Defendants' actions was to increase wholesale prices.
Defendants further argue that there was nothing suspicious about their alleged activities, and that each has an explanation which does not involve a conspiracy. Plaintiff is required to plead facts which render a conspiracy plausible, i.e., they must cross the "line between possibility and plausibility." See Twombly, 550 U.S. at 557, 127 S.Ct. 1955. Plaintiff is not required to show that conspiracy is probable.
Asking for plausible grounds to infer an agreement does not impose a probability requirement at the pleading stage; it simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal agreement. And, of course, a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable , and that a recovery is very remote and unlikely.
Id. at 556, 127 S.Ct. 1955 (internal quotation marks, citation and footnote omitted, emphases added). A fortiori, Plaintiff is not required to disprove all possible alternative explanations to survive a motion to dismiss.
Furthermore, Defendants' arguments ignore the big picture that emerges from the totality of the allegations. Contrary to their protestations, as alleged, their actions were parallel. This includes several instances of tightly synchronized multiple refinery shutdowns, simultaneous exports during a short period of time, an orchestrated run on the market, joint public exaggerations regarding supply disruptions, and other coordinated actions such as unnecessary refinery shutdowns, failure to repair a damaged refinery, idling a Jones Act tanker, and coordinated exports all occurring simultaneously during a time of rising prices.
Defendants point to the fact that California is a concentrated, interdependent market. In markets such as this,
companies base their actions in part on the anticipated reactions of their competitors. And because of this mutual awareness, two firms may arrive at identical decisions independently, as they are cognizant of-and reacting to-similar market pressures. In other words, competitors' behavior may be consciously parallel.
Musical Instruments , 798 F.3d at 1193. Defendants argue that their allegedly parallel conduct resulted from their independent reactions rather than agreement.
Because conscious parallelism alone is not enough to allege an agreement, Twombly, 550 U.S. at 553-54, 556, 127 S.Ct. 1955, it is particularly difficult to allege sufficient facts to support a plausible inference of conspiracy in a concentrated market, see Musical Instruments , 798 F.3d at 1194-98 ; although "[h]eightened fact pleading of specifics" is not required, Twombly, 550 U.S. at 570, 127 S.Ct. 1955. What is required is "context that raises a suggestion of a preceding agreement." Id. at 557, 127 S.Ct. 1955 ; see also Musical Instruments, 798 F.3d at 1194 ("plus factors").
As discussed above, in the amended complaint Plaintiff alleged more than just "parallel conduct and a bare assertion of conspiracy," Twombly, 550 U.S. at 556, 127 S.Ct. 1955, and included several instances of Defendants' conduct against self-interest. While such conduct can sometimes be attributed to conscious parallelism spurred by individual reactions to similar market pressures, see Musical Instruments, 798 F.3d at 1195,
[m]ore extreme action against self-interest, ... may suggest prior agreement-for example, where individual action would be so perilous in the absence of advance agreement that no reasonable *1155 firm would make the challenged move without such an agreement.
Id. Defendants' actions, as alleged, were extreme. For example, in October of 2012, Defendants ran on the market after advance notice from Exxon of the power failure at its Torrance refinery, causing a price increase even before the power failure was announced to the public. In the absence of an agreement, Defendants' run on the market would be against their individual self-interest in the extreme, as their inventories were high, and there was no reason for them to purchase gasoline on the market.
Another example of extreme action against self-interest is the deliberate and apparently unnecessary shutdown of Tesoro's Martinez refinery and Exxon's decision to not repair its Torrance refinery after an accident,[6] both occurring in February 2015. Both decisions were made during the time of rising prices, and would be irrational in the absence of an agreement, as both Defendants exposed themselves to the risk of losing market share to their competitors.
Exxon's further activities in the summer of 2015 were also extreme. Despite the shutdown of its Torrance refinery and price spikes in mid-May and mid-July, it did not deploy its tanker to import gasoline to California, but idled it for months, thus missing the opportunity to sell its Singapore gasoline, which complies with California regulatory requirements, at the highest price obtainable in the United States. It is unlikely that any Defendant would accept loss of revenue on this scale and risk its market share without an agreement that other Defendants would not take competitive advantage.
Finally, in the same vein, Chevron, which had two refinery shutdowns in April 2015, exported 250 million gallons of gasoline during the summer months, thus apparently deliberately missing the opportunity to maximize its profits with the premium prices in California, and exposing itself to loss of market share. Plaintiff's allegations of multiple instances of Defendants' extreme action against self-interest support a reasonable inference of conspiracy.
Another factor independently supporting inference of conspiracy is simultaneous action by multiple competitors made for no other discernible reason than to manipulate the market. See Musical Instruments, 798 F.3d at 1195-96. In this regard, close coordination in timing is critical. Id. at 1196. Defendants' actions were tightly coordinated.
For example, in 2012, five Defendants announced scheduled refinery maintenance shutdowns for the same four-week period between February 5 and March 3. Aside from the significance of the timing of the shutdowns, Defendants' representations about the shutdowns were false, as emissions data demonstrated that some Defendants continued to produce, and gasoline inventories increased. There appears to be no other reason for the coordinated shutdown scheduling but to manipulate the market by creating a false impression of shortage. The close timing in combination with the coordinated misleading announcements supports a reasonable inference of advance agreement.
In 2015, within a 30-day window between April 17 and May 19, Tesoro, Chevron and Phillips reduced or shut down production at six separate refineries.
*1156 Chevron and Phillips even advanced their scheduled maintenance to coincide with other shutdowns. The shutdowns occurred while the prices were headed to their peak in mid-May. The close timing of multiple shutdowns in combination with advancing of scheduled maintenance to bring additional shutdowns within the same time window, and the resulting price increase, support a reasonable inference that this activity was deliberately coordinated to manipulate the market.
Furthermore, in the four-week window between June 25 and July 23, 2015, Defendants deployed nine tankers to export gasoline out of California. This activity started when prices had dropped, and seems to have spurred the mid-July price spike-the biggest one of the year. Significantly, this activity also coincides with Exxon's idling of its Jones Act tanker in Singapore and continued idling of its Torrance refinery. The short time frame of this activity, together with its effect on the prices, supports a reasonable inference of agreement with the intent to manipulate the market.
In February 2016, Tesoro, Chevron, Valero and Phillips simultaneously raised prices at their branded stations by nearly the same amount. Because these Defendants control nearly 80% of California gasoline production and 75% of the retail gas stations, their simultaneous action was sure to manipulate the market. The close timing and the close amount of the increase support a reasonable inference of an agreement. Plaintiff's allegation of several examples of simultaneous action taken for no other discernible reason than to manipulate the market independently supports a reasonable inference of agreement.
Aside from the foregoing, Plaintiff alleged other factors which further support the inference, when considered in the light of multiple instances of extreme action against self-interest and multiple instances of closely coordinated action aimed at market manipulation. For example, Plaintiff alleged that Defendants possessed a common motive to manipulate the market to increase their profits. They belonged to numerous trade and lobbying associations. Plaintiff specifically alleged how WSPA was used to spread misinformation to the public and roil the market in furtherance of the common motive.
Moreover, the price spikes which allegedly resulted from Defendants' actions were inconsistent with economic fundamentals in the California market. In 2012 they were inconsistent with the abundant available supply, decreased demand, and reduced prices in the rest of the United States. In 2015 they were inconsistent with the historically low crude oil prices, available production capacity, and prices in the rest of the United States.
The gasoline prices and Defendants' profits in 2012 and 2015 reached historically unprecedented highs. The magnitude and length of supply disruptions and the price differential between California and the rest of the United States in 2015 were also unprecedented. Finally, Defendants' conduct and its consequences were sufficiently extreme to prompt government investigation into deliberate manipulation of the California market.
Plaintiff's extensive and detailed factual allegations of Defendants' activities, taken as true, support a plausible inference of agreement for purposes of a Sherman Act violation. To the extent Defendants seek dismissal of the Sherman Act claim, their motion is denied.
B. Cartwright Act
The Cartwright Act is "California's equivalent to the Sherman Act," William O. Gilley Enter., Inc. v. Atl. Richfield Co., 588 F.3d 659, 661 (9th Cir. 2009), and "the analysis under the Cartwright Act is identical to that under the Sherman Act,"
*1157 Name.Space, Inc. v. Internet Corp. of Assigned Names and Numbers, 795 F.3d 1124, 1131 n.5 (9th Cir. 2015). Defendants have provided no arguments specific to the Cartwright Act claim. Their motion to dismiss it is denied for the same reasons as with respect to the Sherman Act claim.
C. Unfair Competition Law
The UCL claim is entirely derivative of the Cartwright Act claim, and Defendants do not attack it on any independent grounds. Accordingly, Defendants' motion is denied with respect to the UCL claim as well.
For the foregoing reasons, Defendants' motion to dismiss is denied.
IT IS SO ORDERED.

Only Alon did not belong to the WSPA. All Defendants, in various combinations, belonged to several other trade associations and lobbying organizations, including the American Petroleum Institute, American Fuel & Petrochemical Manufacturers, Society of Independent Gasoline Marketers of America, and Petroleum Marketers Association of America. According to Plaintiff, membership facilitated Defendants' conspiracy by providing an opportunity and a forum to meet, exchange information, and issue public statements. (FAC at 54-56).

On August 2, 2015, Exxon imported some gasoline from its Singapore refinery to Los Angeles, but not enough to make up for lost production. During the same time period, it continued to import other products.

Allegedly Jones Act tankers fly U.S. flags and are the only tankers qualified under federal regulations to carry petroleum products between U.S. ports. Because of their scarcity, they are seldom idled or sent to foreign ports.

These Defendants control nearly 80% of the gasoline production and 75% of the retail gas stations.

During PMAC's December 2014 and February 2015 meetings, its members requested CEC to provide data collected from the gas industry to facilitate PMAC's work. On behalf of its members, including Defendants, WSPA opposed PMAC's request to CEC. According to Plaintiff, the apparent objective was to interfere with PMAC's work by precluding the CEC from complying with the request from its own commission.

The refinery was repaired in mid-2016, after sale to a third party at the end of 2015. (FAC at 28.)